**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 5, 2011

Lyle W. Cayce
Clerk

No. 10-60376

UNITED STATES OF AMERICA ex rel. THOMAS F. JAMISON,

Plaintiff-Appellant,

versus

MCKESSON CORPORATION;
MCKESSON MEDICAL-SURGICAL MEDINET, INC.;
GGNSC HOLDINGS, L.L.C.; GOLDEN GATE ANCILLARY, L.L.C.;
BEVERLY ENTERPRISES, INC.; CERES STRATEGIES, INCORPORATED;
CERES STRATEGIES MEDICAL SERVICES, INCORPORATED,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Mississippi

Before SMITH and STEWART, Circuit Judges.[*]
JERRY E. SMITH, Circuit Judge:

The public disclosure bar of the False Claims Act ("FCA") deprives the district court of jurisdiction whenever *qui tam* relators bring a suit based on publically available information. The district court held that it lacked jurisdiction.

---

[*] Judge Garwood was a member of this panel but died, after oral argument, on July 14, 2011. This matter is decided by a quorum. *See* 28 U.S.C. § 46(d).

No. 10-60376

Because the relator's action included no allegations specific to the defendants, but merely repeated a general description of fraud easily available in several government documents, we affirm.

I.

Thomas Jamison operates a Durable Medical Equipment ("DME" or "DMEPOS") business that provides enteral nutrition products to nursing homes. Under Medicare Part B, such suppliers can obtain a supplier number that allows them to submit reimbursement claims assigned to them by the insured beneficiary. While attempting to sell his product during the late 1990's, Jamison noticed that some nursing homes, including some run by defendant Beverly Enterprises ("Beverly"), turned him down because they had set up joint ventures with other DME suppliers. Jamison soon learned that Beverly had created a subsidiary, Ceres Strategies, Inc. ("Ceres"), which had its own Medicare supplier number.[1] Ceres in turn had entered into a joint venture with McKesson Corporation and its subsidiary, McKesson Medical-Surgical Medinet, Inc.[2] (collectively "McKesson"), a DME supplier, to provide DME to Beverly's nursing homes.

Shortly thereafter, Jamison consulted government reports indicating that Beverly's scheme might be fraudulent. Specifically, he read the 2003 Special Advisory Bulletin, regarding "Contractual Joint Ventures," from the Health and Human Services Office of the Inspector General ("OIG")." That report provided an example of a fraudulent arrangement:

A hospital establishes a subsidiary to provide DME. The new sub-

---

[1] Jamison's information was partly inaccurate. The Beverly subsidiary with a DME supplier number was Ceres Strategies Medical Services, Inc. ("CSMS"). Ceres Strategies was also a subsidiary of Beverly but was a procurement company that did not have a supplier number. *See infra* note 5.

[2] At the time of Jamison's investigation, McKesson Medical-Surgical Medinet, Inc., was known as "Red Line Healthcare."

No. 10-60376

sidiary enters into a contract with an existing DME company to operate the new subsidiary and to provide the new subsidiary with DME inventory. The existing DME company already provides DME services comparable to those provided by the new hospital DME subsidiary and bills insurers and patients for them.

Under such an arrangement, the DME supplier allows the nursing home to keep a portion of the reimbursement from Medicare in return for a guarantee that the nursing home will buy all of its DME from that supplier. With a guaranteed customer, the supplier can charge more for its products, and Medicare will pay the extra cost. At the same time, the nursing home gets less expensive DME. Nonetheless, the arrangement is fraudulent, because the nursing home represents itself as a DME supplier but has merely created a shell company that in fact plays no part in the delivery of DME and that consequently cannot comply with the standards for DME suppliers. *See* 42 C.F.R. § 424.57(c).

In December 2004, Jamison filed a *qui tam* complaint under the FCA against McKesson and Beverly, alleging that they participated in such a fraudulent scheme.[3] The complaint named about 450 other defendants, including other nursing homes, DME suppliers, and owners or officers of such organizations, whom Jamison suspected of setting up similar arrangements.[4] Although Beverly, McKesson, and related entities were included in a list of offenders, the

---

[3] The FCA permits suits by private parties, called "relators," on behalf of the United States against anyone submitting false claims to the government. If the relator is successful, he keeps a percentage of the recovery. 31 U.S.C. § 3730(d). After the relator has filed suit, the action is sealed for sixty days while the government decides whether to intervene. § 3730-(b)(2). If the government chooses not to intervene, the relator may proceed independently. § 3730(4)(B). In this case, the government received extensions for its decision, allowing the complaint to remain sealed through 2008, when the government intervened against Beverly and McKesson.

[4] After the government intervened against Beverly and McKesson, the complaint against the other entities remained sealed until 2010, when the government chose not to intervene. Most of the defendants were dismissed, but Jamison continued his action individually in two cases, *United States ex rel. Jamison v. Gulf South Medical Supply, Inc.,* No. 2:10-CV-147 (N.D. Miss.), which has been stayed pending this appeal, and *United States ex rel. Jamison v. Delta Health Group, Inc.*, No. 2:10-CV-146 (N.D. Miss.).

No. 10-60376

complaint included no specific allegations and described the scheme only generally.

While waiting for the government's decision on intervention, Jamison focused his continued investigations on Beverly and McKesson. He summarized his findings in a letter from his lawyer to the Department of Justice ("DoJ") in November 2005 indicating that Jamison had traveled to Beverly's headquarters and discovered that no entity named "Ceres" had a physical office there. He described further conversations with Beverly's employees through which he learned that McKesson "handles everything" for Beverly and that McKesson, not Ceres, received Beverly's DME orders, delivered the DME, and submitted the claims for reimbursement to Medicare using Ceres's supplier number.

In June 2006, Jamison filed his First Amended Complaint, which contained the same theories of fraud but included specific allegations against Beverly and McKesson.[5] In October 2008, the DoJ decided to intervene. The district court then dismissed Jamison on the ground that his action violated the public disclosure provisions of the FCA.[6] Jamison appeals, arguing that his suit was not based on public disclosures and that he was an original source of the information on which his suit was based.

## II.

"'[A] challenge under the FCA jurisdictional bar is necessarily intertwined with the merits' and is, therefore, properly treated as a motion for summary

---

[5] The First Amended Complaint added CSMS as a defendant, because Jamison had learned that the Beverly subsidiary with a DME supplier number was actually CSMS, not Ceres, as he had previously thought.

[6] Those provisions were amended effective July 22, 2010. Pub. L. No. 111–148, 124 Stat. 119, 901, § 10104(j)(2) (Mar. 23, 2010). The amendments do not apply retroactively to suits pending at the time they became effective. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010). We thus address the statute as it existed before the amendments.

No. 10-60376

judgment." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004) (citation omitted). We review a summary judgment *de novo*, applying the same standard as the district court. *Id.* Summary judgment will be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute at to any material fact and the movant is entitled to judgment as a matter of law. *Id. See* FED. R. CIV. P. 56(a).

## III.

Before the 2010 amendments, the public disclosure provisions of the FCA provided that

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (2006). We have distilled those provisions into a three-part test, asking "1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information." *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995).

We need not follow the three steps rigidly, however. *See, e.g., United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008)

No. 10-60376

(combining the first two steps). Indeed, combining the first two steps can be useful, because it allows the scope of the relator's action in step two to define the "allegations or transactions" that must be publicly disclosed in step one. That is, for the public-disclosure bar to apply, the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint, because that is all that is needed for the action to be "based on" the publically disclosed allegations.

## A.

Consequently, we ask first whether Jamison's action was based upon public disclosures of allegations or transactions. Before we undertake that inquiry, however, there are two preliminary issues.

### 1.

The first relates to the burden of proof. Typically, the party seeking to invoke federal jurisdiction bears the burden of demonstrating that jurisdiction is proper. *Santos v. Reno*, 228 F.3d 591, 594 (5th Cir. 2000). In regard to the first two steps of the public disclosure bar under the FCA, however, that rule would require the relator to prove a negative: that there are *no* public disclosures of allegations or transactions upon which his action is based. We do not construe our precedent to require such an impossibility. Nonetheless, once the opposing party has identified public documents that could plausibly contain allegations or transactions upon which the relator's action is based, the relator bears the burden of demonstrating that they do not.

In the context of this summary judgment motion, that rule means that the defendants must first point to documents plausibly containing allegations or transactions on which Jamison's complaint is based. Then, to survive summary judgment, Jamison must produce evidence sufficient to show that there is a gen-

uine issue of material fact as to whether his action was based on those public disclosures.[7]  In evaluating that question, we view the evidence Jamison produces in the light most favorable to him.

### 2.

Second, before defining the scope of Jamison's action, we must decide which of his complaints is relevant to that issue.  He contends that we should look to his first amended complaint, the last complaint before the government's intervention, as the most complete picture of his allegations.  For support, he relies on *Rockwell International Corp. v. United States*, 549 U.S. 457, 473-74 (2007), which held that the court can lose jurisdiction over an otherwise sound action if the relator amends his complaint to remove the basis of the jurisdiction.

"[T]he term 'allegations' is *not limited to* the allegations of the original complaint."  *Id.* at 473 (emphasis added).  The Court did not hold, however, that the original complaint is irrelevant to jurisdiction or that a relator need not establish jurisdiction from the moment he first files his action.  Indeed, *Rockwell* did not speak to the question whether a relator can use an amended complaint to establish jurisdiction when the original complaint is lacking.  Consequently, we fall back on the longstanding rule that the amendment process cannot "be used to create jurisdiction retroactively where it did not previously exist."[8]  If

---

[7] *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (describing the allocation of the burden of proof in a typical summary judgment case).

[8] *Aetna Cas. & Sur. Co. v. Hillman,* 796 F.2d 770, 775 (5th Cir. 1986) (holding that  jurisdiction "cannot be created retroactively by substituting a diverse claimant for a nondiverse party," because the district court must have jurisdiction "[a]t the commencement of th[e] suit").  As the *Aetna* court recognized, 28 U.S.C. § 1653, which allows amendment of "[d]efective allegations of jurisdiction," applies to cure only technical defects in the allegations of jurisdiction, not substantive defects in jurisdiction. *Aetna*, 796 F.2d at 775-76 (emphasis added). Jamison wishes to invoke the first amended complaint's amendments to the scope of Jamison's action, which is a substantive jurisdictional fact under the FCA's public disclosure provisions.

No. 10-60376

Jamison's complaint did not establish jurisdiction, it should have been dismissed; his amendments cannot save it.

B.

We thus look to Jamison's original complaint to define the scope of his action and to determine whether it was based on public disclosures of allegations or transactions. That complaint described various fraudulent schemes only generally. For example, it alleged that "Defendants have entered into illegal joint ventures in order to obtain referrals and increase the amount of money paid to Defendants through Medicare Part B. Defendants are engaged in a variety of such illegal joint ventures, and they are created through a number of schemes." The complaint then described several possible schemes, but without alleging which defendants engaged in which schemes or what particular actions were fraudulent. At no point did the complaint include particular allegations against any defendant. Instead, it merely listed almost 450 nursing homes, DME suppliers, and their owners or employees, and it indicated generally that they participated in some of the schemes Jamison described.[9]

Accordingly, we ask whether the "action" described in the complaint—general allegations of fraud combined with an undifferentiated list of defendants—is "based upon" allegations or transactions in publically disclosed documents. The defendants point to ten documents that they say publicly disclosed Jamison's allegations.[10] Some of those documents, such as the *DMERC Medicare*

---

[9] Indeed, it is highly unlikely that Jamison's original complaint satisfied the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (applying Rule 9(b) to actions under the FCA). That issue is not before us.

[10] The documents include a series of reports from the Department of Health and Human Services Office of the Inspector General ("OIG"), including: OIG, *Special Advisory Bulletin*:
(continued...)

No. 10-60376

*Advisory* article, merely restate the law applicable to DME suppliers. Others describe a typical joint-venture fraud. Those documents include general statements that such fraud is "proliferating" and also list signs that indicate when such fraud may be present. None of those documents names any particular perpetrators or the defendants.

The only public disclosure that names any of the defendants is the National Supplier Clearinghouse DME Supplier Directory, which is merely a list of companies with a DME supplier number and which includes an entry for CSMS. It does not indicate that any of the listed companies engaged in fraud.

Nonetheless, the public disclosures need not name particular defendants so long as they "alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation." *In re Natural Gas Royalties*, 562 F.3d 1032, 1039 (10th Cir. 2009). For example, in *Natural Gas Royalties*, a Senate report indicated that drillers on federal lands were improperly measuring the extracted gas. The disclosures "named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices." *Id.* at 1042. Although the reports had not named all the defendants, they made it easy for the government to examine its royalty contracts to discover which drillers were using fraudulent measurement techniques. "[T]he public

---

[10] (...continued)
*Contractual Joint Ventures* (2003); OIG, *Medical Equipment Suppliers: Compliance with Medicare Standards* (2001); Compliance Program Guidance for the Durable Medical Equipment, Prosthetics, Orthotics and Supply Industry, 64 Fed. Reg. 36368 (OIG July 6, 1999); Compliance Program Guidance for Third Party Medical Billing Companies, 63 Fed. Reg. 70138 (OIG Dec. 18, 1998); OIG, *Enteral Nutrient Payments in Nursing Homes* (1996); OIG, *Medicare Services Provided to Residents of Skilled Nursing Facilities* (1994); OIG, *Special Fraud Alert: Joint Venture Arrangements* (1989). The defendants also cite a 2005 GAO report. *See* GAO, *Medicare: More Effective Screening and Stronger Enrollment Standards Needed for Medical Equipment Suppliers* (2005). Finally, they point to the National Supplier Clearinghouse Medicare Part B DMEPOS Supplier Directory and an article from the September 1996 *DMERC Medicare Advisory* entitled "National Supplier Clearinghouse Supplier Standards Expanded."

No. 10-60376

disclosures provided specific details about the fraudulent scheme and the types of actors involved in it" sufficient to "set the government on the trail of the fraud" and ensure that the government will not "need to comb through myriad transactions performed by various types of entities in search of potential fraud." *Id.* at 1042-43.[11]

The decision in *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994), however, cautions against applying the reasoning behind *Natural Gas Royalties* too broadly. In *Cooper*, government reports indicated widespread fraud in the health insurance industry. The reports did not serve to lead the government to the defendant, however, because the industry was too large, and the industry-wide allegations were not specific enough. The court noted that barring a relator's suit in that circumstance

> would preclude any *qui tam* suit once widespread—but not universal—fraud in an industry was revealed. The government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money. But it has difficulty identifying all of the individual actors engaged in the fraudulent activity. This casting of a net to catch all wrongdoers is precisely where the government needs the help of its "private attorneys general."

---

[11] Other cases in which courts have found a *qui tam* suit barred by disclosures of industry-wide fraud include *United States v. Alcan Electrical & Engineering, Inc.*, 197 F.3d 1014 (9th Cir. 1999) (holding that where public disclosure identified a "narrow class of suspected wrongdoers—local electrical contractors who had worked on federally funded projects over a four-year period," the government, as the one who hired the contractors, has ready access to documents identifying which contractors in particular committed fraud); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997) (holding that disclosure that employees' clubs throughout the federal government were inappropriately retaining revenue from vending services was sufficient to alert the government to the practice); and *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995) (holding that disclosure that two of nine DOE laboratories were engaging in the fraudulent practice "sufficiently alerted the government to the likelihood" that the other seven laboratories might also engage in the practice).

10

No. 10-60376

*Id.* at 566 (citations omitted).[12]

By applying *Cooper*'s guidance, we see that the defendants' documents, considered alone, likely are not sufficient publically to disclose allegations specific to Beverly and McKesson. The DME Medicare supplier industry[13] and the nursing home industry[14] are large. The public disclosures do not indicate that fraud is universal or even widespread within them, but merely that OIG is "concerned that contractual joint venture arrangements are proliferating."[15] Moreover, nothing in the documents would "set the government on the trail of" Beverly or McKesson in particular.

One of the documents, the 1996 OIG report on *Enteral Nutrient Payments in Nursing Homes*, zeros in on a somewhat smaller industry—enteral nutrient providers—by indicating that most nursing homes pay too much for enteral nutrition. That report does not identify fraud as a possible cause of the high prices, however, so there is no reason to assume that the joint-venture schemes identified in the other reports are any more common among suppliers of enteral nutrients. It thus would have been exceedingly difficult for the government to identify, from the public disclosures, which particular suppliers or nursing

---

[12] *Accord United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011) (holding that a public disclosure indicating that 57% of the Medicare claims from chiropractors are fraudulent was not sufficient to bar a suit against one chiropractor, because it still "takes a provider-by-provider investigation to locate the wrongdoers").

[13] In 2009, there were about 70,000 entities with DME supplier numbers. *See* Press Release, Centers for Medicare and Medicaid Services, New Medicare Requirements Take Effect for Suppliers of Medical Equipment and Supplies (Oct. 1, 2009) (stating that the 50,000 DME suppliers who have been accredited are "over 70 percent" of current DME suppliers).

[14] In 2004, there were approximately 16,000 nursing homes in the United States. Centers for Disease Control and Prevention, http://www.cdc.gov/nchs/fastats/nursingh.htm (last visited July 13, 2011).

[15] OIG, *Special Advisory Bulletin: Contractual Joint Ventures* (2003).

homes were committing fraud.[16]

As indicated above, however, we are not examining the public disclosures in the abstract but rather are comparing them to the allegations in Jamison's original complaint. As we have said, that complaint contained only general allegations. Like the public disclosures, it contained no information about any actions specific to Beverly or McKesson. Indeed, one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme in the DME supplier industry. The complaint thus appears to be "based upon" the public disclosures, despite their generality.

There is one piece of information that the original complaint provides that cannot be found in the public disclosures: the identification of the defendants. Because the original complaint names almost 450 defendants, however, even that identification may have failed to provide any new information. Rather than gathering evidence and zeroing in on particular perpetrators, Jamison appears merely to have listed a large cross-section of possible defendants.[17] It takes no particular knowledge or effort to describe a general scheme of fraud and then list arbitrarily a large group of possible perpetrators, but that is all Jamison appears to have done.

---

[16] Indeed, the government stated in argument to the district court that the public disclosures were insufficient to lead it to the fraud:

> Simply put, [none of the public disclosures] would lead a reasonable Government investigator to suspect that Defendants engaged in the kickback and sham DME scheme at issue in the [suit]. . . . The United States unequivocally supports Mr. Jamison's contention that he brought the allegations of Defendants' misconduct to the United States' attention.

[17] Indeed, the defendants assert that Jamison merely sued the entire Mississippi DMEPOS industry. We have no way of verifying that assertion, but their general point is persuasive: Jamison's complaint paints with a broad brush and fails to target any particular defendant.

No. 10-60376

The arbitrariness of Jamison's selection of defendants is indicated by the fruits of his suit. After a lengthy investigation, the government chose to inter-vene against only the seven defendants named in this appeal, out of the almost 450 defendants. The cases against the others presumably lacked merit, which would be consistent with the inference that Jamison selected them arbitrarily.

Jamison points to no evidence that would cause us to question that conclu-sion. At his deposition, his attorney repeatedly objected whenever Jamison was asked to explain how he chose the defendants, on the ground that the *qui tam* complaint was sealed to protect the identity of the other defendants. We thus have no evidence about how Jamison made the selection.[18] The burden is on him, however, to show that his identification of the defendants provided useful information and that his complaint was thus not "based upon" general allega-tions of fraud and an arbitrary list. Jamison has provided no such evidence, so there is no issue of material fact as to whether that is the case.[19]

---

[18] Jamison did state generally that he gathered information about the defendants through his experience as a DME seller, conversations with others in the industry, and research on the internet. For example, he stated that

> this has been a long process of gathering information over years and learning companies and who they are since I got into this business. And—but basically, the names of the defendant came from doing research in nursing homes, on the internet, just basically digging, because that's—that's my job as a salesperson.

Those statements are too vague and general, however, to provide useful information about how Jamison identified the defendants.

Jamison also knew that before filing his complaint, Beverly had a subsidiary with its own DME supplier number. After identifying Beverly as a possible defendant, however, that information was easily available from public sources. In any event, although a nursing home possessing a DME supplier number is a possible indicator of fraud, that is by no means con-clusive. Jamison's identification of Beverly's DME supplier subsidiary thus is not sufficient to show that his investigation usefully identified perpetrators of joint-venture fraud.

[19] After filing the original complaint, of course Jamison began to focus his investigation on Beverly and McKesson. At that time, he engaged in a series of conversations with Beverly's employees, had one of his own employees, Leslie Barlow, engage in similar conversations, and

(continued...)

13

No. 10-60376

Were we to rule otherwise, a *qui tam* relator could arbitrarily select a large group of defendants in any industry in which public disclosures have revealed significant fraud, in hopes that his allegations will prove true for at least a few defendants.  We do not countenance such relator lotteries, which are quintessentially "parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud" and which the public disclosure bar is designed to prevent.  *Reagan*, 384 F.3d at 174.  We thus conclude that Jamison's action was based upon publicly disclosed allegations or transactions.

## C.

Consequently, we move to step three, under which the district court had jurisdiction over the action only if Jamison was "an original source of the information" supporting his allegations.  31 U.S.C. § 3730(e)(4)(A) (2006).[20]  The FCA defines "original source" to mean "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006). Knowledge is direct if it is "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others."  *Reagan*, 384 F.3d at 177 (citation and internal quotation marks omitted).  Moreover, knowledge is independent if it "is not derived from the public disclosure."  *Id.* (citations omitted).

---

[19] (...continued)
even traveled to Beverly's headquarters for an onsite investigation.  In light of our conclusion that we must focus on the original complaint, however, we do not consider the information Jamison uncovered in those investigations when evaluating whether his action was based on the allegations in the public disclosures.

[20] Section 3730(e)(4)(A) also allows the action if it is "brought by the Attorney General," an exception that no party argues is applicable.

No. 10-60376

In light of our observation that Jamison's complaint merely listed a large group of possible defendants, without identifying specific allegations about any particular one, it is obvious that he was not a "direct" or "independent" source of any of the "information on which the allegations are based." Indeed, "the information on which the allegations are based" includes merely the general description of the fraud and an arbitrary list of many of the DME suppliers and nursing home operators in Mississippi. Consequently, Jamison is not at original source of the allegations in his complaint.

In sum, the FCA public disclosure bar applies, and the district court lacked jurisdiction. The judgment of dismissal is AFFIRMED.