# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10046

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2017

Lyle W. Cayce
Clerk

United States of America, ex rel, PAUL J. SOLOMON,

  Plaintiff - Appellant

v.

LOCKHEED MARTIN CORPORATION; NORTHROP GRUMMAN
SYSTEMS CORPORATION,

  Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge.

Paul Solomon brought a False Claims Act action against his employer Northrop Grumman and against Lockheed Martin for making false claims against the government. On a motion for summary judgment, the district court held that it lacked jurisdiction over Solomon's claims based on the Act's public disclosure bar. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

Paul Solomon worked for Northrop Grumman Systems Corporation. Northrop was a subcontractor to Lockheed Martin Corporation on the

No. 17-10046

development of the F-35 Joint Strike Fighter. Lockheed was awarded a Cost Plus Award Fee contract for the F-35, which permitted Lockheed to receive periodic award fees for meeting government performance benchmarks during the life of the project. Lockheed shared its award fees with its subcontractor Northrop. Under the Systems Design and Development contract (the "SDD contract") for the project, the government required both Lockheed and Northrop to monitor continually and report costs and performance under a system known as the Earned Value Management System ("EVMS"). EVMS is a set of guidelines, metrics, and control systems that allows the government to maintain real-time awareness of program costs and spending.

To evaluate EVMS metrics, the government required, through the terms of the SDD contract, that Lockheed submit monthly Cost Performance Reports ("CPRs") that included up-to-date Estimates at Completion ("EACs") for each portion of the project. EVMS guidelines required that reported EACs be the "most likely" estimate for the total cost of completing the project. The SDD contract also required Lockheed to maintain a "management reserve" budget for unanticipated challenges arising during the project. EVMS and SDD contract provisions forbid contractors from using management reserve funds to compensate for cost overruns or improve cost performance metrics.

Northrop submitted reporting data to Lockheed, who in turn submitted monthly CPRs to the government. The SDD contract provided for the monitoring and measurement of EVMS compliance in at least two ways. First, it mandated access for government auditors from the Defense Contract Management Agency ("DCMA"). Second, under a joint Surveillance Plan established between Northrop and the DCMA, Northrop was to self-report EVMS compliance directly to the government through its own employee auditor.

2

No. 17-10046

In September 2005, Northrop assigned Solomon to serve as "EVMS Monitor" or EVMS "Focal Point" for the Joint Strike Fighter program. Solomon drafted the Surveillance Plan on behalf of Northrop, co-signed by his DCMA counterpart, outlining the ways in which Northrop would comply with its EVMS contractual obligations. According to Solomon, he had full discretion, as the Focal Point, "to direct the scope of [his] investigations, including any accounts or compliance issues that came to [his] attention." Solomon submitted his surveillance reports directly to the DCMA. The DCMA frequently co-signed the reports. Over the course of the project, Solomon revealed in his surveillance reports that Lockheed and Northrop were authorizing retroactive application of management reserve funds to improve cost-performance overruns. According to Solomon, this constituted false cost variance reporting that led to Lockheed and Northrop being awarded fees they would not have otherwise received.

In 2007, the DCMA conducted an EVMS audit of Lockheed. In its report, the DCMA concluded that Lockheed was not in compliance with a number of EVMS guidelines, including mismanagement and improper use of management reserve funds to keep "the cost performance index (CPI) from worsening." In 2008, the Government Accountability Office ("GAO") filed a similar report, noting that Lockheed was "using management reserve funds to alter its own and subcontractor performance levels and cost overruns." In August 2007, Northrop transferred Solomon to a different project. He nonetheless continued to investigate the F-35 project and was given a copy of a Memorandum of Agreement ("MOA") by another Northrop supervisor. The unsigned MOA between Northrop and Lockheed allegedly indicates Lockheed's instructions to Northrop to meet a budget of $3.721 billion despite it being a "significant performance challenge[.]" If Northrop was unable to meet the

3

required target, Lockheed indicated it would use management reserve funds to increase Northrop's budget.

Solomon retired in 2008.  He filed a *qui tam* action under the False Claims Act ("FCA") in 2012, alleging that both Lockheed and Northrop submitted false claims to the government.  Lockheed and Northrop moved for summary judgment, arguing that Solomon triggered the FCA's jurisdictional bar.  The district court held that Solomon was jurisdictionally barred because his complaint could have been synthesized from public disclosures, and he did not qualify as an original source because his reports to the government had been nonvoluntary.  Solomon timely appealed.

## DISCUSSION

For purposes of appellate review, a challenge under the FCA's jurisdictional bar is the equivalent of a motion for summary judgment because it is necessarily intertwined with the merits.  *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011).  "We review a summary judgment *de novo*, applying the same standard as the district court."  *Id.* Summary judgment is proper "if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute a[s] to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* Additionally, the parties do not dispute that because Solomon's claims concern events prior to 2010, this case is governed by the FCA's language immediately prior to the 2010 amendments to the Act.

Under the FCA, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable to the United States Government for civil penalties.  *See* 31 U.S.C. § 3729(a)(1) (2012).  The pre-2010 version of the FCA contains the following jurisdictional bar, a provision now altered in the current FCA:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (2006).

We have previously applied the FCA's jurisdictional bar by using a three-part test, "asking '1) whether there has been a "public disclosure" of allegations or transactions, 2) whether the qui tam action is "based upon" such publicly disclosed allegations, and 3) if so, whether the relator is the "original source" of the information.'" *Jamison*, 649 F.3d at 327 (citation omitted). The purpose of the jurisdictional bar is both to promote private citizen involvement in fraud exposure while also "preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004) (citation omitted).

## I.    *Original vs. Amended Complaint*

The district court first analyzed whether its jurisdictional analysis should be based on Solomon's original complaint or instead the amended complaint which added a fraudulent inducement claim against Northrop and Lockheed. The court examined only the original complaint because of our holding that when a plaintiff's original "complaint did not establish jurisdiction, it should have been dismissed; his amendments cannot save it."

*Jamison,* 649 F.3d at 328. Solomon fails to raise any arguments on appeal concerning the district court's decision to rely only on his original complaint. Accordingly, we also examine only Solomon's original complaint in evaluating the FCA jurisdictional bar.

## II.    *Whether there was a "public disclosure"*

Under our test, we compare the allegations contained in Solomon's original complaint with public disclosures available at the time the complaint was filed. *Id.* at 327. If the complaint could have been synthesized from the disclosures, then we determine if the complainant was the original source of the disclosures. *Id.* at 331. The first issue, then, is whether there was any public disclosure of allegations or transactions that pre-dated Solomon's FCA complaint. Lockheed and Northrop cite to three potentially relevant public disclosures in arguing for application of the FCA jurisdictional bar. These are a 2007 DCMA EVMS compliance report, a March 2008 GAO report, and the model Joint Strike Fighter Systems Design and Development contract. The district court presumed that the DCMA and GAO reports were valid public disclosures, focusing on the second part of the test asking whether Solomon's complaint was based upon the disclosures. We also start with the second part of the test because Solomon does not argue the two reports and the contract were not public disclosures. Instead, he claims his complaint was not based upon them.

## III.    *Whether Solomon's complaint was based upon public disclosures*

The second part of the FCA jurisdictional test determines whether the complaint is "based upon" any public disclosures. *See id.* Under *Jamison,* once the defendants have identified public disclosures that could plausibly be the source of the FCA complaint, a plaintiff "must produce evidence sufficient to

show that there is a genuine issue of material fact as to whether his action was based on those public disclosures." *Id.*

A plaintiff's FCA complaint is based upon public disclosures if "one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme[.]" *Id.* at 331. The public disclosures must therefore provide "'specific details about the fraudulent scheme and the types of actors involved in it' sufficient to 'set the government on the trail of the fraud[.]'" *Id.* at 329 (quoting *In re Natural Gas Royalties*, 562 F.3d 1032, 1042–43 (10th Cir. 2009)).

We recently adopted a test embraced by other circuits for determining whether public disclosures contain sufficient indicia of an FCA violation to bar a subsequently filed FCA complaint. *See United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 374 (5th Cir. 2017) (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). Under this approach, "the combination of X and Y must be revealed, from which the readers or listeners may infer Z[.]" *Id.* (quoting *Springfield Terminal*, 14 F.3d at 654). Z is an inference of fraud under the FCA, while X and Y are two required elements for the inference: "a misrepresented state of facts *and* a true state of facts." *Springfield Terminal*, 14 F.3d at 655. "The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Id.*

This complaint is based on public disclosures for FCA purposes if the facts publicly available to Solomon could have been synthesized to form the same inference he now alleges in his complaint. *See Jamison,* 649 F.3d at 331. The complaint alleges "Lockheed knowingly presented to the government false cost variance data, including data which incorporated Northrop's false cost variance data. This false data was used by the government, directly or indirectly, in determining how much of an award fee to grant Lockheed."

No. 17-10046

The first of the three potentially relevant public disclosures is the DCMA report.  It found Lockheed had "misapplied [Management Review] budgets to open, internal, discrete work packages in order to prevent the cost performance index (CPI) from worsening."  While Lockheed referred "to this practice as a risk mitigation strategy, the government review team concluded that the actual purpose was to improve the CPIs of various [Work Breakdown Structure] elements."  The DCMA report stated that the approach "misrepresents the actual condition of cost and schedule status." *Id.*  The effect was substantial: "EACs of 17 major subcontractors have been routinely altered by [Lockheed], resulting in unreported overruns of ~$124M."  Similarly, the March 2008 GAO report stated that the "DCMA [report] found that [Lockheed] was using management reserve funds to alter its own and subcontractor performance levels and cost overruns."

The final disclosure, the Joint Strike Fighter contract, is discussed later.

Lockheed and Northrop argue that the DCMA and GAO findings comprise both the misrepresented state of facts (X) and the true state of facts (Y) for an inference of an FCA violation (Z).  Solomon argues that his complaint is not based on these disclosures because neither disclosure expressly or implicitly alleges fraud.  He argues that despite the findings of the report, "DCMA failed to make the connection between the misuse of Management Reserve and the fraud."  Solomon's argument fails.  The public disclosures need not expressly allege fraud.  The question is whether the relator *could have* synthesized an inference of fraud from the public disclosures.  *See Jamison*, 649 F.3d at 331.

Solomon further argues that the public disclosures do not provide the necessary components of the *Springfield Terminal* formula because they fail to link "the misuse of Management Reserve to Defendants' scheme to intentionally and improperly understate the EAC."  Additionally, Solomon

8

argues that neither the DCMA nor GAO reports link the receipt of award fees with understated EACs. This, he argues, is accomplished only through his provision of the MOA between Lockheed and Northrop, which demonstrates that not only did Lockheed and Northrop submit false EACs, but they did so "intentionally."

By arguing that only the non-public MOA provides a necessary element of intentionality, Solomon overstates the threshold for an FCA claim. The language of the FCA conveys congressional intent to prohibit *qui tam* actions "when either the allegation of fraud *or* the critical elements of the fraudulent transaction themselves were in the public domain." *Springfield Terminal,* 14 F.3d at 654 (emphasis added). Thus, the MOA is not relevant to whether Solomon's complaint is based on public disclosures. When the elements of a fraudulent transaction are present in public disclosures, those public disclosures need not allege fraud in explicit language. *See id.*

Public disclosures will be sufficient if they provide details "such that the defendant's misconduct would have been readily identifiable" and "furnish evidence of the fraudulent scheme alleged." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012). The DCMA report states that Lockheed "was using management reserve funds to alter its own and subcontractor performance levels and cost overruns." The report identified Lockheed's purpose: "to prevent the cost performance index (CPI) from worsening." Thus, the DCMA report sufficiently indicates misconduct and leads at least to an inference of fraud under the *Springfield Terminal* test. Applying *Little*, we also conclude that the DCMA and GAO reports allege facts that make a potentially fraudulent scheme readily identifiable: Lockheed and its subcontractors were violating contracting regulations by using their management reserve budgets to compensate for over-budget expenditures that

would have otherwise raised their cost performance indexes and estimates at completion reported to the government.

Solomon finally argues that this information, by itself, is insufficient because technical violations of EVMS guidelines and contract provisions do not necessarily trigger FCA violations. He argues that a necessary piece of the puzzle is that estimates at completion were the basis for the government issuing award fee bonuses at various phases of the project. Without this awareness, misuse of management reserve budgets to inflate cost performance indexes does not support financial loss to the government. Solomon asserts that only the nonpublic MOA provides that piece. To the contrary, Northrop argues that the model Joint Strike Fighter System Design and Development contract, which Solomon concedes was publically available at the time he filed his complaint, explicitly cites cost performance index reporting as a criteria for the disbursement of award fees.

Solomon argues that "[t]he simple fact that the model SDD contract was available on a government website does not mean that anyone with an understanding of Defendants' EVMS discrepancies would ever think to search for the model contract." We are not concerned however, with the overall probability of someone inferring fraudulent activity from the public disclosures. The focus is on whether they *could have* made the inference. *See Jamison*, 649 F.3d at 331.

Solomon has failed to "produce evidence sufficient to show that there is a genuine issue of material fact as to whether his action was based on those public disclosures." *Id.* at 327.

IV.    *Whether Solomon qualifies as an original source*

Even though Solomon's complaint was based upon public disclosures, his FCA complaint may proceed if he is the original source of the publically

disclosed information. *Id.* We use a two-part test in determining the original source exception: "(1) the relator must demonstrate that he or she has direct and independent knowledge of the information on which the allegations are based and (2) the relator must demonstrate that he or she has voluntarily provided the information to the Government before filing his or her qui tam action." *Reagan*, 384 F.3d at 177 (quotation marks and citation omitted).

The test is stated in the conjunctive, meaning a negative answer to either will require dismissal of the complaint. The district court declined to reach the question of direct and independent knowledge because it held that Solomon did not voluntarily report the information. We decide the opposite question, which is permitted because we can resolve the appeal on any ground that was presented to the trial court. *Breaux v. Dilsaver*, 254 F.3d 533, 538 (5th Cir. 2001). Solomon does not present any arguments concerning direct and independent knowledge on appeal, but he did brief the issue on summary judgment below.

"Knowledge is direct if it is 'derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others.'" *Jamison*, 649 F.3d at 332 (quoting *Reagan*, 384 F.3d at 177). Additionally, "knowledge is independent if it 'is not derived from the public disclosure.'" *Id.* (citations omitted).

Solomon's FCA claim alleges both the improper use of management reserves *and* the connection of those budget alterations to obtaining award fee bonuses. Even if we assume Solomon had direct and independent knowledge about the improper use of management reserves, he lacked direct knowledge about the connection between management reserves and award fee bonuses. Because the model SDD contract was publically available and tied cost performance to award fees, Solomon must have direct and independent knowledge of the connection between cost performance and award fees as

11

described in the contract.  Solomon himself concedes that based on his own level of knowledge, he could only "suspect" that there might be some relationship between cost performance and award fees.  He explicitly states that he needed to ask another Northrop supervisor "whether there was any connection between cost variance numbers and Award Fees[.]"  After the supervisor allegedly denied such a connection, Solomon only recognized the connection between cost performance and award fees by reading the SDD contract.

Knowledge can only be independent if it is *not* derived from the public disclosure.  *Id*.  Here, the record makes clear Solomon derived his knowledge about the connection between cost performance and award fees from portions of a contract that were publically disclosed before he filed his complaint.  He fails to demonstrate that he is the original source of the model SDD contract.

Accordingly, we lack jurisdiction to hear Solomon's claims under the FCA's public disclosure bar.

AFFIRMED.