United States Court of Appeals,

Fifth Circuit.

No. 92-4954.

George S. NALLE, III, and Carole Nalle, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Charles A. BETTS and Sylvia I. Betts, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Aug. 16, 1993.

Appeal from a Decision of the United States Tax Court.

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

George and Carole Nalle and Charles and Sylvia Betts (collectively, the "taxpayers") appeal a decision of the Tax Court upholding the assessment of an income tax deficiency against them by the Commissioner of Internal Revenue (the "Commissioner"). Because we find the treasury regulation pursuant to which the Commissioner assessed the deficiency to be an invalid interpretation of the statute, we reverse.

I.

George Nalle ("Nalle") owns a fifty-percent interest in the Heritage Square Joint Venture, which, between 1982 and 1984, identified eight buildings in and around Austin that were appropriate for rehabilitation and relocation, five of which were slated for demolition in order to accommodate the expanding campus of the University of Texas at Austin. All eight houses were purchased and moved to the Heritage Square office subdivision in suburban Rollingwood, where they were restored to substantially the same style and condition as originally constructed.[1]

---

[1] The three houses not removed to make way for expansion of the campus were found in other parts of Texas and were moved, variously, 20, 70, and 80 miles to Heritage Square.

Because each house was more than forty years old on the date rehabilitative work commenced, Nalle claimed an investment tax credit for over $500,000 of the rehabilitation performed in tax years 1983-86, pursuant to section 48(g) of the Internal Revenue Code (the "Code"), 26 U.S.C. § 48(g). Heritage did not claim the tax credit for expenditures incurred in refurbishing one of its properties, the Julia Harris house, but passed the credit on to the purchasers, appellants Charles and Sylvia Betts, who reported a credit for $35,934 on their joint 1983 federal tax return, $14,322 of which was carried back to their 1980 return.

On June 28, 1985, the Internal Revenue Service ("IRS") published proposed treasury regulation 26 C.F.R. § 1.48-12, subsection (b)(5) of which set forth a requirement that "qualified rehabilitated buildings" such as were eligible for the section 48(g) tax credit not have been relocated within forty years of the date on which rehabilitation was begun. The regulation was adopted in final form on October 7, 1988, and was applied retroactively to rehabilitation expenditures incurred after December 31, 1981. The IRS audited the taxpayers' returns for 1983-86, and on June 9, 1989, issued a statutory notice of deficiency disallowing the credits.

In the Tax Court, it was stipulated that the houses qualified for the rehabilitation tax credit but for the exclusion of relocated properties contained in section 1.48-12(b)(5). The taxpayers argued that the new regulation was invalid because it added a requirement to the statute that had not previously existed, yet was passed pursuant to the Commissioner's *interpretive* authority under 26 U.S.C. § 7805(a) and not pursuant to any *legislative* authority conferred by Congress with respect to section 48(g). The Commissioner countered that the regulation was not inconsistent with the statutory text and vindicated a central policy goal of the original legislation (as revealed by the legislative history)—the revitalization of decayed and deteriorating areas. The Tax Court ruled in favor of the Commissioner, citing the support for his position contained in the legislative history of the tax credit.

II.

An interpretive regulation promulgated pursuant to the Commissioner's authority under section 7805(a) is generally "entitled to substantial weight." *Lykes v. United States,* 343 U.S. 118,

127, 72 S.Ct. 585, 590, 96 L.Ed. 791 (1952).[2] The Supreme Court has provided us with substantial

guidance in reviewing the propriety of such regulations:

> In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute.

*National Muffler Dealers' Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59

L.Ed.2d 519 (1979).

## III.

The dispute here is the interpretation of one subsection of the Code provided by a regulation

issued more than five years after the subsection it purports to interpret. The key subsection is section

48(g)(1)(A), which, as it existed for the tax years in question,[3] set out a three-part test governing

eligibility for the rehabilitative investment tax credit:

> (A) In general.—The term "qualified rehabilitated building" means any building (and its structural components)—

> (i) which has been rehabilitated,

> (ii) which was placed in service before the beginning of the rehabilitation, and

> (iii) 75 percent or more of the existing external walls of which are retained in place as external walls in the rehabilitation process.

Only the last of these requirements, referred to by the parties as the "external wall test,"

concerns us. It is the taxpayers' contention that the external wall test means more or less what it

says—that a building may qualify for the tax credit only if its structure remains substantially the same

---

[2]Section 7805(a) provides, in pertinent part, that "the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a) (Supp.1993). Although the section expressly refers to the Treasury Secretary, the Commissioner is an authorized delegate of the Secretary. *See* 26 C.F.R. § 601.601(a)(1).

[3]Section 48 was redesignated as section 47 by the Omnibus Budget Reconciliation Act of 1990, Pub.L. 101-508, § 11813, 104 Stat. 1388—536 *et seq.*

as before rehabilitation. The test, they say, simply serves to distinguish new construction, for which no credit is allowed, from rehabilitation, for which the credit is available. The Commissioner, relying largely upon a deferential review of agency determinations, argues that section 1.48-12(b)(5), which divines in the external wall test a restriction on relocation of non-historic rehabilitated buildings, is not inconsistent with the origin and purpose of the statute.[4]

As previously noted, the Tax Court upheld the regulation on the basis that it "harmonized" with congressional intent, at least as revealed by selected passages from the credit's legislative history:

> The legislative history of section 48 reveals that it is not, as petitioners contend, solely a device to promote the rehabilitation of older buildings. From its inception, the tax credit for rehabilitation expenditures was intended to provide an economic stimulus for those areas susceptible to economic decline and abandonment, particularly the "central cities and neighborhoods of all communities."

*Nalle v. Commissioner,* 99 T.C. 187, 195, 1992 WL 184967 (quoting H.R.REP. No. 1445, 95th Cong., 2d Sess. 86, *reprinted in* 1978 U.S.C.C.A.N. 7046, 7121).

We are mindful, at the outset, of Justice Scalia's recent reference to the use of legislative history as oftentimes being "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff,* --- U.S. ----, ----, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring). Our reading of the scant legislative history surrounding the 1978 adoption and 1981 amendment of section 48(g) suggests that, in this case, the Tax Court picked its few friends from an otherwise indifferent crowd.

Foremost among those friends is the above-quoted House report on the Revenue Act of 1978, which first extended the investment tax credit—previously restricted to equipment and machinery—to non-historical, non-residential buildings. According to the report, among the reasons for the change

---

[4]Section 1.48-12(b)(5) states, in part, as follows:

> *Location at which the rehabilitation occurs.* A building, other than a certified historic structure ... is not a qualified rehabilitation building unless it has been located where it is rehabilitated for the thirty-year period immediately preceding the date physical work on the rehabilitation began in the case of a "30-year building" or the forty-year period immediately preceding the date physical work on the rehabilitation began in the case of a "40-year building."

26 C.F.R. § 1.48-12(b)(5) (1992).

was as follows:

> Presently, there is a similar concern [to that which gave rise to the investment tax credit for machinery and equipment] about the declining usefulness of existing, older buildings throughout the country, primarily in central cities and older neighborhoods of all communities....

> The committee believes that it is appropriate now to extend the initial policy objective of the investment credit to enable business to rehabilitate and modernize existing structures. This change in the investment credit should promote greater stability in the economic vitality of areas that have been developing into decaying areas.

1978 U.S.C.C.A.N. at 7121.

In 1981, Congress imposed a three-tiered structure upon the tax credit: Rehabilitated historic structures would receive a 25% credit, structures at least forty years old a 20% credit, and thirty-year-old structures, 15%. The Tax Court also cited the legislative history of this amendment to validate the Commissioner's regulation. The Senate Report states as follows:

> The tax incentives for capital formation provided in other sections of this bill might have the unintended and undesirable effect of reducing the relative attractiveness of the existing incentives to rehabilitate and modernize older business structures. Investments in new structures and new locations, however, do not necessarily promote economic recovery if they are at the expense of older structures, neighborhoods, and regions. A new structure with new equipment may add little to capital formation or productivity if it simply replaces an existing plant in an older structure in which the new equipment could have been installed. Furthermore, the relocation of business can result in substantial hardship for individuals and communities. Since this hardship does not affect the profitability of the business, it may not have been fully taken into account in the decision to relocate, even though it is an economic detriment to the society as a whole.

> The increased credit for rehabilitation expenditures is intended to help revitalize the economic prospects of older locations and prevent the decay and deterioration characteristics of distressed economic areas.

S.REP. No. 144, 97th Cong., 1st Sess. 72, *reprinted in* 1981 U.S.C.C.A.N. 105, 177.

As the above excerpts attest, the Tax Court's conclusion that the 1988 regulation vindicated the statute's intent to revitalize depressed areas, stated most forcefully in the legislative history appended to the 1981 amendments, is not entirely without foundation; Congress undoubtedly considered the bill's revitalizing potential as among its more attractive features. Thus, the Commissioner contends that the prohibition on relocation contained in section 1.48-12(b)(5) naturally arises from Congress's broadly expressed intent (in the legislative history) to benefit depressed communities. Absent such a prohibition, the Commissioner maintains, nothing prevents a taxpayer

from doing ostensibly what the taxpayers have done here: relocating old buildings from one neighborhood to another without conferring any visible benefit upon the "distressed economic areas" whose plight Congress sought to ameliorate.

This fact, however, urged so strenuously by the Commissioner as determinative of the issue before us, cannot support the stress he places upon it. Contrary to the Commissioner's interpretation, the legislative history never speaks in exclusive terms of the goal of urban revitalization, nor can it be said that Congress structured the statute to vindicate such a goal exclusive of other concerns. Had it intended to do so, a restriction upon the credit's availability solely to "certified" depressed areas would seem in order, just as the credit for historic rehabilitation was limited to certified historic structures. Even with the regulatory prohibition on relocation in place, the statute presents a singularly imprecise means for revitalizing depressed areas: *Any* old building, even one located in a wealthy area, may still qualify, so long as it is not moved—even to a *depressed* area.

A better reading of the legislative history is that Congress merely anticipated that urban revitalization would be a *collateral* benefit of the legislation. The 1978 history speaks primarily of a desire to redress the then-skewed incentives leading businesses to invest in new equipment and machines *and* new buildings to house them. While the old buildings targeted by the credit are "*primarily* in central cities and older neighborhoods" (emphasis added), nothing in either the statute or the history suggests that they are exclusively so or that the credit should be limited to those that are. Rather, the explanation of the provision expresses the expectation that, as an added bonus, "[t]his change ... should promote greater stability in the economic vitality of areas that have been developing into decaying areas." 1981 U.S.C.C.A.N. at 7121.

The legislative history to the 1981 amendment states the revitalization goals of the statute in far stronger terms than does the 1978 history, but it too must be understood in its proper context. The 1981 amendment merely *increased* (and differentiated depending on age and historical value) the credit, in order to enhance the relative attractiveness to businesses of rehabilitating old structures *vis-à-vis* relocating to newer ones. Thus, the language stressing the negative impact of relocation on depressed communities meant relocation from old to new buildings, *not* from poor to wealthy areas;

just as with the 1978 history, the Congress was acting on the expressed assumption that *most* of the old buildings subject to the credit were in depressed areas, and, therefore, that the increased credit would benefit those neighborhoods *primarily.*

The inconclusiveness of the legislative history, however, is by no means dispositive. If it were, we might be inclined to side with the Commissioner, in light of the deference courts generally owe to interpretations of a statute by an agency charged with its enforcement. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). Here, however, we deal not with the sort of "legislative regulation" at issue in *Chevron, see id.* at 843-44, 104 S.Ct. at 2782, but with an interpretive regulation promulgated under the Commissioner's authority pursuant to section 7805(a). Accordingly, "we owe the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981); *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982).

More significant for purposes of judicial analysis, however, is the lack of ambiguity in the statute. In section 48(g), Congress crafted a detailed and reasonably precise means for determining eligibility for the tax credit; the three-part "external wall test" and the statutory definitions of all key phrases evidence that Congress left relatively little for the Commissioner to interpret. Like the regulation invalidated in *Vogel Fertilizer,* section 1.48-12(b)(5) "purports to do no more than add a clarifying gloss on a term ... that has already been defined with considerable specificity by Congress." 455 U.S. at 24, 102 S.Ct. at 827.

In the absence of any ambiguity, our analysis must be confined to the plain language of the statute. As the Supreme Court has stated,

> Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity, but in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive. Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete.

*Burlington N. R.R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d

404 (1987) (citations and internal quotation marks omitted). Before the Tax Court, the Commissioner anchored section 1.48-12(b)(5)'s interpretation of the statute in the "external wall test" of section 48(g)(1)(A)(iii). According to the Commissioner, that subsection's dictum that seventy-five percent of the pre-existing external walls must be "retained in place" in order to qualify for the credit necessarily implies a limitation on relocation: " 'Retained' and 'retained in place' must have different meanings.... [E]ither the words 'in place' provide a restriction on location, or they are superfluous." *Nalle,* 99 T.C. at 190 (alteration in original).

We discern, however, a number of difficulties with the Commissioner's "plain language" interpretation of section 48(g). While, generally, it is a tenet of statutory construction that every word must be given meaning where possible, such that no word or phrase is rendered superfluous by interpretation, the original regulations for the tax credit defined "retained in place" and said *nothing* respecting a restriction on the relocation of rehabilitated structures.[5] The considerable detail of the regulation suggests that, had Congress intended to incorporate some such restriction within the phrase "retained in place," here was an opportunity for the Commissioner to mention it. His failure to do so until after the taxpayers had acted in reliance upon the 1980 proposed regulations weighs heavily in our analysis, inasmuch as *National Muffler* directs us to consider not only such reliance

---

[5]Initially proposed and published in 1980, *see* 45 Fed.Reg. 71368, 71369 (1980), § 1.48-11(b)(4)(iv) was issued in its final form in 1985, *see* 50 Fed.Reg. 26696, 26699 (1985), and reads as follows:

> *Retained in place.* An existing external wall is retained in place if the supporting elements of the wall are retained in place. An existing external wall is not retained in place if the supporting elements of the wall are replaced by new supporting elements. An external wall is retained in place, however, if the supporting elements are reinforced in the rehabilitation, provided that such supporting elements of the external wall are retained in place. An external wall is retained in place even though it is covered (e.g., with new siding). Moreover, the existing curtain may be replaced with a new curtain provided that the structural framework that provides for the support of the existing curtain is retained in place. An external wall is retained in place notwithstanding that the existing doors and windows in the wall are modified, eliminated, or replaced. A wall may be disassembled and reassembled so long as the same supporting elements are used when the wall is reassembled. Thus, for example, in the case of the brick wall, the wall is considered retained in place even though the original bricks are removed (for cleaning, *etc.*) and put back to form the wall.

26 C.F.R. § 1.48-11(b)(4)(iv) (1992).

upon a regulation, but also the consistency of the Commissioner's interpretation of the statute when scrutinizing regulations for their fidelity to the Congressional mandate. *See National Muffler,* 440 U.S. at 477, 99 S.Ct. at 1307.

More damning of the Commissioner's claim that section 1.48-12(b)(5) merely clarifies the statute's application is its logical incoherence. As written, the regulation expressly exempts certified historic structures; they may still be relocated and qualify for the credit. But the Commissioner does not explain how the statutory phrase "retained in place," when applied to old buildings, means that they may not be relocated from their original site, but implies no such limitation when applied to old, *historic* buildings.[6]

Similar attempts at such investment tax credit alchemy by the Commissioner have been rejected recently by two courts intimately familiar with tax appeals. *See Griffin Indus. v. United States,* 92-2 U.S.T.C. (CCH) ¶ 50,606 at 86129 (Cl.Ct.1992) (invalidating 26 C.F.R. § 1.48-9(g)(1)); *Pepcol Mfg. Co. v. Commissioner,* 98 T.C. 127, 134, 1992 WL 17457 (1992) (en banc) (same). The Commissioner cannot explain away this ultimate incompatibility of his regulation with the statute by reference to the legislative history; where a plain reading of the statute precludes the Commissioner's interpretation, no legislative history—be it ever so favorable—can redeem it.[7]

---

[6]We note that the statute was amended in 1986 to divorce the treatment of certified historic structures from that of non-historic qualified rehabilitated buildings by limiting the application of the external wall test solely to the latter structures. *See* Tax Reform Act of 1986, Pub.L. No. 99-514, § 251(b), 100 Stat. 2085, 2184 (1986). The amendment renders the Commissioner's interpretation of the phrase "retained in place" at least plausible, if only as applied prospectively from the date of passage. But here the Commissioner has sought to extend § 1.48-12(b)(5) retroactively to rehabilitation expenditures incurred after December 31, 1981. That the statute had to be amended to conform to the regulation, rather than the reverse, strongly implies the regulation's invalidity as an interpretation of the statute prior to the amendment.

Moreover, Treasury regulation 26 C.F.R. § 1.191-2(e)(6) formerly expressly provided that the expenses incurred in relocating a certified historic structure could be included in the rehabilitation expenses subject to amortization under Code § 191. Although § 191 was repealed in the Economic Recovery Tax Act of 1981, Pub.L. 97-34, § 212(d)(1), 95 Stat. 172, 239, it is further evidence of the implausibility of § 1.48-12(b)(5)'s interpretation of the statute.

[7]Lastly, we point out that while the Commissioner disputes the taxpayers' contention that § 1.48-12(b)(5) creates an additional requirement to those contained in the statute, the taxpayers simply are quoting the Commissioner's own words back to him. The notice of proposed rulemaking that introduced § 1.48-12(b)(5) in 1985 stated that "[t]he proposed regulations

We find, therefore, that the interpretation urged by the Commissioner, and embodied in section 1.48-12(b)(5) finds no support in the statutory text. While this resolution relieves us of the need to reach the taxpayers' argument against the retroactive application of the regulation, we find troubling the Commissioner's understanding of the appropriate burden to be placed upon taxpayers seeking to comply with the Code. According to the taxpayers, they closely examined the Code and accompanying regulations available at the time they conceived their business plan. According to the Commissioner, the taxpayers were wanting in diligence; somehow, they were obliged not only to consult the legislative history, but to glean therefrom the doubtful conclusion that their credits would be disallowed were they to relocate the buildings after rehabilitating them.

Thus to require similarly-situated taxpayers in the future to examine the legislative history before relying upon the plain-spoken word of Congress would be to teach what we believe to be

> a false and disruptive lesson in the law. It says to the bar that even an "unambiguous [and] unequivocal" statute can never be dispositive; that, presumably under penalty of malpractice liability, the oracles of legislative history, far into the dimmy past, must always be consulted. This undermines the clarity of law, and condemns litigants (who, unlike us, must pay for it out of their own pockets) to subsidizing historical research by lawyers.

*Conroy,* --- U.S. at ----, 113 S.Ct. at 1567 (Scalia, J., concurring) (brackets in original). Yet this "false and disruptive lesson in the law" is precisely that which the Tax Court took upon itself to teach the taxpayers in this case. "Confronted with recently enacted legislation, and in light of the magnitude of their rehabilitation project," the court stated, "petitioners should have examined the statute and its background in greater detail prior to proceeding with the purchase of the buildings." *Nalle,* 99 T.C. at 196. We disagree and, accordingly, REVERSE the decision of the Tax Court.

---

contain *additional restrictions* applying in the case of buildings that have been moved." *See* L.R. 238-81, 1985-2 C.B. 777, 778 (emphasis added).