# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2015

Lyle W. Cayce
Clerk

No. 14-20156

UNITED STATES OF AMERICA, ex rel; RANDALL L. LITTLE; JOEL F. ARNOLD,

Plaintiffs-Appellants,

v.

SHELL EXPLORATION; PRODUCTION COMPANY; SHELL DEEPWATER DEVELOPMENT SYSTEMS, INCORPORATED; SHELL OFFSHORE, INCORPORATED,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:07-CV-871

Before DAVIS, WIENER, and HAYNES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

In this case under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., we previously reversed the district court's grant of summary judgment in favor of Defendants-Appellees Shell Exploration & Production Company, Shell Deepwater Development Systems, Inc., and Shell Offshore, Inc. (collectively "Shell").[1] Relevant to this appeal, we concluded in our earlier opinion that the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] *See Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282 (5th Cir. 2012).

## No. 14-20156

district court had "applied an overly broad definition of [public] disclosure" to determine that the fraudulent scheme alleged by Relators-Appellants Randall F. Little and Joel F. Arnold ("Relators") was barred because of previous public disclosures, primarily regulatory proceedings and lawsuits. We remanded the case for the district court to apply the more narrow standards set out in our opinion.[2] On remand, Shell filed a re-urged motion for summary judgment, which the district court granted nearly one year later in a five-page opinion.[3]

Relators appeal from the district court's final judgment dismissing their claims with prejudice.[4] For the reasons set out below, we conclude that there is no evidence of public disclosure, so we reverse the district court's judgment, remand this action, and direct the Chief Judge of the Southern District of Texas to reassign the case to a different district judge.

## I.    FACTS

In the prior appeal, we set out the basic facts as follows:

> In early 2006, relators Randall Little and Joel Arnold filed two *qui tam* suits against Shell in the Western District of Oklahoma. They alleged that Shell had defrauded the U.S. Department of the Interior of at least $19 million. Specifically, they charged that from October 2001 through 2005, Shell had deprived the United States of royalties by taking unauthorized deductions for expenses to gather and store oil on twelve of its offshore drilling platforms.
>
> At the time their suits were filed, Little was a Senior Auditor and Arnold a Supervisory Auditor for the Minerals Management Service (MMS), an agency within the Department of the Interior that

---

[2] *Id.* at 293-94.

[3] *Little v. Shell Exploration & Prod. Co.*, No. CIV.A. H-07-871, 2014 WL 869326 (S.D. Tex. Mar. 5, 2014) (hereinafter "Second District Court Opinion").

[4] The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1345, and we have jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

No. 14-20156

administered Shell's leases. . . .

> The cases were transferred from Oklahoma to the Southern District of Texas on March 2, 2007, and consolidated there by the parties' joint request. *See* 28 U.S.C. § 1404(a); Fed. R. Civ. P. 42(a).

> In April 2011, the district court granted summary judgment to Shell on the ground that two distinct False Claims Act provisions prohibited the suit: Section 3730(b)(1), describing who may bring suit, and the public disclosure bar contained in Section 3730(e)(4)(A), (B).[5]

We reversed on both grounds. First, we concluded that the FCA did not prohibit government employees from filing *qui tam* actions.[6] Second, we concluded that the district court erred by applying an overly broad standard for "public disclosure" and remanded for a redetermination.[7] Because this appeal largely concerns whether the district court failed to follow our mandate on remand with respect to the public disclosure issue, it is worth setting out the previous panel's analysis of this issue under 31 U.S.C. § 3730(e)(4), starting with the public disclosure bar itself:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source"

---

[5] *Little*, 690 F.3d at 284-85 (footnote omitted).

[6] *Id.* at 286-92.

[7] *Id.* at 294.

## No. 14-20156

> means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.[8]

We explained that, "[o]n summary judgment, the opposing party must first identify 'public documents that could plausibly contain allegations or transactions upon which the relator's action is based.'"[9] If such putative disclosures are identified, "the relator must put forth 'evidence sufficient to show that there is a genuine issue of material fact as to whether his action was based on those public disclosures.'"[10]

> In its motion for summary judgment, Shell designated five categories of evidence: (1) civil proceedings, (2) news media accounts, (3) two published articles, (4) certain communications between the company and MMS, and (5) a 2002–2003 audit. This is the full universe of materials appropriately under consideration. *See id.* On appeal, the parties' chief focus has been category one. Specifically it consists of three prior False Claims Act cases, as well as several administrative decisions.[11]

We noted that, if Relators were correct that the fourth and fifth categories (certain communications and an audit) had never been publicly disseminated, "then they would not be proper subjects for analysis."[12] We also concluded that Relators cannot be original sources for purposes of the public disclosure bar,

---

[8] 31 U.S.C. § 3730(e)(4) (2006).

[9] 690 F.3d at 292 (quoting *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011)).

[10] *Id.* (quoting *McKesson,* 649 F.3d at 327).

[11] *Id.*

[12] *Id.* at 292 (citing *United States ex rel. Reagan v. E. Tex. Med. Ctr.,* 384 F.3d 168, 175-76 (5th Cir. 2004), and *Webster's Third New International Dictionary* 1836 (1993) (defining "public" as "exposed to general view")).

before we moved on to the central questions, which remain at issue in this appeal:

> The remaining questions thus are "1) whether there has been a 'public disclosure' of allegations or transactions, [and] 2) whether the *qui tam* action is 'based upon' such publicly disclosed allegations." *McKesson,* 649 F.3d at 327 (quotation marks and citation omitted). We have held that "the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint." *Id.* In *McKesson,* we found sources such as a restatement of the applicable law and "general statements that [a type of] fraud is 'proliferating'" inadequate to trigger the disclosure bar on their own. *Id.* at 329–30. The bar applied only because the complaint at issue "described various fraudulent schemes only generally" and was devoid of "particular allegations against any defendant." *Id.* at 328, 330–31.[13]

We found that the district court had failed to examine Relators' complaint at the appropriate level of detail:

> By contrast, the complaint here identifies Shell by name, gives a specific time period, and offers details about the scheme. When specifics are alleged, it is crucial to consider whether the disclosures correspond in scope and breadth. A guiding query is whether "one could have produced the substance of the complaint merely by synthesizing the public disclosures' description" of a scheme. *Id.* at 331. Correlation in detail is not the only question. It can be that disclosures "provide[] specific details about the fraudulent scheme and the types of actors involved in it" such that the defendant's misconduct would have been readily identifiable. *Id.* at 329–30 (discussing *In re Natural Gas Royalties,* 562 F.3d 1032, 1039 (10th

---

[13] *Id.* at 293.

No. 14-20156

Cir. 2009), while cautioning to use its reasoning sparingly).

At an "irreducible minimum," we explained, "the disclosures [must] furnish evidence of the fraudulent scheme alleged," and we characterized the alleged scheme at issue in this case as "a willful violation of MMS rules and guidelines in order to deduct the costs of gathering (or upstream costs) from royalty-in-kind payments."[14] We concluded that the district court failed to apply these standards:

> In granting summary judgment, the district court relied on similarities between what was publicly disclosed and what was stated in the complaint:
>
>> For an action to be based on public disclosure, the disclosure and the factual basis of the suit need not be identical. Rather, the public disclosure must have been sufficient for the government to find related frauds, even though the circumstances of the transactions may differ.
>>
>> Little and Arnold say that Shell fraudulently deducted oil transportation costs on the Mineral Management Service's Form 2014s for specific oil leases from October 2001 through December 2005. The record shows that the earlier, notorious claims are parallel to the auditors' suit. Little and Arnold complain by merely applying public information—in both senses—to specific leases that they investigated for the government.
>>
>> Little and Arnold admit as much in their

---

[14] *Id.* (citing *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,* 540 F.3d 1180, 1187 (10th Cir. 2008)).

response to Shell: "The cases listed by Shell identify wrongful acts committed by several petroleum companies, in different time periods, on different leases, and for different products." Changing 2005 to 2006, carbon dioxide to gas, on-shore to off-shore, tract A to tract B, and Shell for Exxon do[es] not change the mechanism of the fraud or the obviousness that the question would potentially apply to every operator of a federal lease. Lower payment of royalties are identical from deducting transportation costs.

The district court's ultimate conclusion about public disclosure could be correct, but the court applied an overly broad definition of such disclosure. The district court's listing of what had to be changed from the publicly disclosed information to what is in the complaint cuts against the conclusion that the complaint is based on the disclosures. It is not apparent from the district court's analysis that Little and Arnold "could have produced the substance of the complaint merely by synthesizing the public disclosures' description of" the scheme. *McKesson,* 649 F.3d at 331.[15]

Given these deficiencies, we remanded for the district court "to reexamine the summary judgment evidence" and address specific issues:

The district court should determine whether the public disclosures identified in the motion for summary judgment reveal either (i) that Shell was deducting gathering expenses prohibited by program regulations, or (ii) that this type of fraud was so pervasive in the industry that the company's scheme, as alleged, would have been easily identified.[16]

---

[15] *Id.* at 293-94.

[16] *Id.* at 294 (citing *McKesson,* 649 F.3d at 329).

No. 14-20156

We remanded in 2012, and Shell filed a renewed motion for summary judgment on March 29, 2013, which remained on the docket for nearly a year before the district court again granted summary judgment, dismissing all of the relators' claims with prejudice. The court's five-page opinion on summary judgment again found that Relators' claims were precluded by the public disclosure bar.[17] Relators appealed, contending that the district court ignored the Fifth Circuit's mandate on remand and erred in dismissing their claim on summary judgment. They also seek to have the case reassigned to a different district judge.

## II.    LAW AND ANALYSIS

### A.    The District Court Disregarded Our Mandate.

Relators contend that the district court disregarded our mandate on remand and erred in granting summary judgment on the public disclosure issue. We agree.

In its opinion on remand, the district court never cited our previous opinion, and the only reference to it is found at the end of the Background section:

> In 2011, this court dismissed [Relators'] claims, holding that government auditors cannot sue as "private persons" under the False Claims Act. On appeal, that part of this court's decision was reversed. On remand, the remaining issue is whether this suit is barred because the claims were based on public information.[18]

That passage does not make clear that we also vacated the district court's dismissal based on the public disclosure issue and explained the legal

---

[17] *See* Second District Court Opinion.

[18] *Id.* at *1.

standards that the district court should apply on remand.

In its analysis, the district court did not apply the more exacting legal standards we required on remand, such as the requirement that "the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint" and the determination of "whether the disclosures correspond in scope and breadth" to the allegations in the complaint.[19] It also failed to address the specific questions we remanded for it to address: "whether the public disclosures identified in the motion for summary judgment reveal either (i) that Shell was deducting gathering expenses prohibited by program regulations, or (ii) that this type of fraud was so pervasive in the industry that the company's scheme, as alleged, would have been easily identified."[20]

Not only did the district court fail to follow these explicit instructions, but the analysis set out in its short opinion is so broad, conclusory, and unsupported by the summary judgment record that we are compelled to conclude it did not comply with our instructions.

## B.    The District Court Erred In Granting Summary Judgment In Favor Of Shell.

Our analysis does not end there. As we noted in our previous opinion, the public disclosure bar is a jurisdictional challenge to an FCA claim, which "is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment. We review a summary judgment *de novo*, applying the same standard as the district court."[21] We conclude that the district court would have found no public disclosure and therefore would have

---

[19] *Little*, 690 F.3d at 293 (quoting *McKesson*, 649 F.3d at 327).

[20] *Id.* at 294 (citing *McKesson*, 649 F.3d at 329).

[21] *McKesson*, 649 F.3d at 326 (internal quotation marks and citations omitted).

No. 14-20156

denied Shell's motion for summary judgment if it had followed our mandate.

In just over two pages, the district court separated its analysis of the alleged public disclosures into four sections: public debate, administrative disclosure, judicial disclosure, and government investigation. The district court concluded that there were public disclosures in the first three categories and reasoned that the non-public disclosures in the government investigation were still somehow relevant to the public disclosure analysis. The district court erred with respect to all four categories.

### 1.    **Public Debate**

The district court's entire analysis of this category is as follows:

> In 1998, the United States elicited comments to clarify the distinction between gathering and transportation. Shell told the Minerals Management Service that it should be able to deduct "gathering"—the cost of moving oil to a central accumulation or treatment station—as transportation. It also attended conferences about classifying gathering and transportation.
>
> Arnold and Little say that debates before the agency's ruling did not disclose Shell's later decision to deduct its gathering as transportation. When considered in combination with the other disclosures, it did, however, alert the public that Shell was in a position to deduct these costs and that it wanted to deduct them. This disclosure alone would have allowed anybody to write Arnold and Little's speculative petition, hoping discovery would confirm their hunch.[22]

This conclusion is based on a misinterpretation of the summary judgment record and the law.

---

[22] Second District Court Opinion at *2.

10

No. 14-20156

During the public comment period in question, Shell argued that the rules for classification of gathering costs versus transportation costs should be changed, but MMS rejected the proposed changes and kept the language of the rule the same, providing some additional guidance. Essentially, the district court concluded that because Shell participated in the regulatory process in a *lawful* manner to try to change the rules in its favor, the public should have been on notice that Shell intended to act *unlawfully* with respect to the resulting regulations, which remained unchanged.[23]

The district court's conclusion is incorrect. We must determine whether there were "public disclosure of allegations or transactions" of fraud.[24] Shell's declaring its desire to change the law through the regulatory process was neither an allegation nor an actual transaction of fraud. Announcing a desire to change regulations through legal means cannot shield a party (through the public disclosure bar) from liability for later actual fraud. Neither the district court nor Shell has cited any legal authority for that proposition, and our research discloses none. In sum, Shell's ordinary participation in the regulatory process does not constitute a public disclosure of later fraudulent behavior.

### 2.     Administrative Disclosure

With respect to administrative disclosure, the district court focused on certain reports which MMS disclosed in 2002:

> Shell has produced agency reports that disclose the practice that Arnold and Little pleaded. In 2002, the Minerals Management Service disclosed reports showing that Shell told the United States that it

---

[23] We recognize that, at this stage, the allegations of Shell's fraud are just that, allegations, so our references to Shell's "fraud" should not be taken as a comment on the ultimate merits of this case.

[24] 31 U.S.C. § 3730(e)(4) (2006).

considered gathering transportation. The same papers also clarified the agency's position on what constitutes transportation.

In 1997, the Interior Board of Land Appeals—an administrative body that hears appeals from the Minerals Management Service—allowed Shell to deduct the cost of upgrading its platform to store transportation equipment. Shell then told the agency that it intended to deduct these capital expenses.

Arnold and Little say that this did not disclose Shell's deduction of gathering expenses. This was not the only part of the practice that Arnold and Little pleaded. They also said that Shell was improperly deducting capital costs to improve its platforms. Because of the 1997 appeal, that practice was entirely within the public domain.[25]

The district court substantially mischaracterized Shell's supposed administrative disclosure. Its broad characterization of the reports disclosed in 2002 is problematic because MMS apparently disclosed a number of things in response to a 2002 Freedom of Information Act ("FOIA") request, including:

- the public rulemaking record for the proposed rule change discussed above;

- an October 1999 letter to MMS in which Shell's attorney informed MMS that it planned to deduct transportation allowances for capital costs consistent with a 1997 administrative decision concerning the Auger deepwater platform, *Shell Offshore Inc.*, 142 IBLA 71, 1997 WL 816169 (1997) (discussed below); and

- correspondence between Shell and MMS regarding the Mars administrative decision regarding deduction of costs for subsea movement from the Mars deepwater platform to the royalty measurement point (discussed below).

---

[25] Second District Court Opinion at *2.

No. 14-20156

We have already addressed the first item, the public rulemaking record. The correspondence from Shell to MMS regarding the Auger and Mars decisions does not support the district court's broad characterization that "Shell told the United States that it considered gathering transportation."[26] Those administrative decisions are factually inapposite to the claims asserted by Relators in this case.

### a)     Relators' Claims

At this point, it is worth examining Relators' claims in more detail. This consolidated case includes two complaints concerning a total of twelve discrete leases: six leases in the first complaint, filed on February 15, 2006, and six in the second, filed on March 14, 2006. As background, the complaints explain that under 30 C.F.R. § 206.101, gathering costs are those concerned with the "movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area, or to a central accumulation or treatment point off the lease, unit, or communitized area that BLS or MMS approves for onshore and offshore leases, respectively." The complaints refer to this accumulation or treatment point as the "custody transfer point."

The complaints allege that the federal lessee is generally responsible for all costs of moving the oil *to* the custody transfer point at no cost to the government, i.e., without deducting the gathering costs. If the oil must travel beyond that to market, the lessee may deduct the costs associated with that additional movement, called "transportation costs," from the royalties.

All the leases at issue here specified that Shell was to provide a marketable product on or immediately adjacent to the lease area at no cost to the United States. The six leases at issue in the February 2006 complaint also

---

[26] *Id.*

provided that the government had the option to require delivery "at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point." That alternative provision is irrelevant here because Relators claim that for each of the twelve leases at issue, the custody transfer point was located either on the same lease or on an adjacent lease, and therefore all costs were non-deductible gathering costs under the lease language and applicable law.

Both of the administrative decisions at issue on summary judgment, the Auger and Mars decisions,[27] concerned facts substantially different from the fraudulent scheme alleged by Relators.

### b)   Auger Administrative Decision

Some background to the Auger decision is necessary: Federal regulations allow certain capital costs to be deducted from royalties owed to the government, specifically "costs for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of the transportation system."[28] All other capital costs (such as those typically associated with a drilling platform) are non-deductible because, like gathering costs, they are incidental to getting the oil to a marketable state.

Shell kicked off the Auger administrative process by requesting that MMS allow it to deduct a portion of the capital costs of a floating production platform as transportation costs in moving the minerals to an onshore market.[29] Shell was already deducting transportation costs relating to other

---

[27] In its opinion, the district court was apparently referring to the Auger decision, but the Mars decision was also part of the summary judgment record, and Shell relied on it in this appeal.

[28] *See* 30 C.F.R. § 206.156(a) (1997) (now 30 C.F.R. § 1206.157(b)(2)).

[29] *See generally Shell Offshore Inc.*, 142 IBLA 71, 1997 WL 816169 (1997)

parts of the transportation system, such as the gas line running from the platform and the compressor, but Shell argued that a portion of the platform construction cost was attributable to transportation and should therefore be deductible.

MMS refused to allow the deduction, analogizing to *Phillips Petroleum Co.*, 109 IBLA 4 (1989), and *The Texas Co.*, 64 Interior Dec. 76 (1957), which decisions disallowed gathering costs because "the cost of gathering the gas from the wells and transporting it to the point of sale in the field is deemed to be one of the ordinary incidents of lease operation."[30] Shell argued that the Auger platform was not a typical production platform whose sole functions involved production and gathering. Rather, Shell had needed to build the platform so large precisely so it could accommodate machinery used to transport the minerals to shore, and it should be able to include that additional portion of the platform cost associated with the transportation function in its allowable transportation costs. On appeal, the Interior Board of Land Appeals ("IBLA") agreed with Shell.

The IBLA concluded that the issue was ultimately a question of fact. The parties agreed that "costs are allowable if they are attributable to an integral part of a transportation system," such as the gas line running from the platform, the compressor, and associated equipment, all of which had already been subject to cost deductions.[31] It also noted that it was agreed "that the Auger platform would have been smaller and less costly by a specifically calculated amount if the compressor and other transportation machinery were not required to be there."[32] Although "MMS has not allocated drilling platform

---

[30] *Id.* at 73 (quoting *The Texas Co.*, 64 Interior Dec. at 80).

[31] *Id.* at 74.

[32] *Id.*

costs to transportation in the past, there is no showing that any prior drilling platform, in addition to providing a place to drill, also needed to be constructed and designed specifically to support an associated transport facility."[33] The IBLA distinguished this situation from the ones presented in *Phillips* and *The Texas Co.* because "the floating platform described by Shell's engineers is a construction that is clearly not one of the ordinary incidents of lease operation. It is a complex and unusual structure that must be evaluated for what it is."[34]

> The word "integral," used by the MMS rule defining allowable capital costs, is an adjective modifying the phrase "part of the transportation system." . . . Given the facts of this case, it is an inescapable conclusion that the cost of building additional buoyancy capacity to carry the transportation equipment fixed to the Auger platform was incurred for transportation purposes, and that the augmented platform buoyancy is an integral part of the Auger gas transportation system, the other parts of which have already been approved for allowance by MMS. Under the cited rules and consistent with prior cases cited by both parties, Shell is entitled to include the cost expended on the Auger platform needed to buoy the compressor and other transportation equipment as a reasonable actual transportation cost under 30 C.F.R. § 206.157(b)(2).[35]

In other words, the Auger decision was premised on the fact that a portion of the Auger platform was necessary to transport the minerals to shore, and that portion of the platform's capital cost integral to transportation was deductible*, to the extent other transportation costs were deductible*. The IBLA distinguished the Auger platform's additional transportation functions from the typical (nondeductible) production and gathering costs associated with

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

16

platforms.

What the Auger decision means is that if Shell is already deducting transportation expenses as allowed for moving minerals to market, it may *also* deduct the portion of the capital costs of constructing a platform if that portion is required for the transportation. The Auger decision does *not* say that Shell may recharacterize gathering costs as transportation costs.

This action is premised on Relators' assertion that it was impossible for Shell to incur *any* transportation costs because the oil was required to be delivered in kind at no cost to the government at the custody transfer point on or adjacent to each lease at issue. The Auger decision specifically distinguished the additional (deductible) transportation functions of the Auger platform from the traditional production and gathering functions of a platform, which remain nondeductible. Because the Auger decision only concerns properly deductible transportation costs, it is irrelevant to the claims presented here.

The district court apparently found it significant that, following the 1997 Auger decision, Shell's attorney wrote a letter to MMS advising it that "[b]ased upon the previous Auger decisions of [MMS] and the IBLA, Shell intends to take transportation allowances consistent with decisions rendered in that matter." Because the Auger decision did not concern the fraudulent scheme alleged by Relators in this case, this letter showing Shell's intention to act *consistent* with the decision does not have anything to do with the scheme at issue here. The district court found the letter significant only because the court summarized Auger (without naming or citing it) at far too high a level of generality, in direct violation of our previous opinion. We conclude that the Auger decision was not a public disclosure of the scheme at issue here.

17

No. 14-20156

### c)    **Mars Administrative Decision**

The district court did not mention the Mars administrative decision, but Shell referred to it before the district court and on appeal. With respect to the Mars proceeding, Shell was producing gas in marketable quantity at the MC 807 platform. MMS issued an order approving commingling the MC 807 block with the WD 143 platform. That would mean that WD 143 would be set as the royalty measurement settlement point, and Shell would be required to move its gas approximately 60 miles from MC 807 to WD 143. Shell believed that, given the 60-mile distance and the fact that the gas was already of marketable quality at MC 807, it was more appropriately characterized as transportation and not gathering, but it wanted to secure MMS's approval to take the transportation deduction.

In an August 25, 1999 letter from Shell to MMS, Shell clarified what it was asking:

> To clarify what Shell is requesting, we are seeking a decision . . . only on whether the pipeline running from Mississippi Canyon 807 (MC 807) TLP at Mars to the West Delta 143 (WD 143) platform is eligible for transportation allowance. No request has been made to MMS for an MMS declaration on any line moving from a well in one of the Mars Units to the TLP at MC 807.

That correspondence is irrelevant to this case because in the present situation, the minerals were *not* moved a great distance away; indeed, Relators specifically alleged that the minerals were produced on or adjacent to the custody transfer point, so Shell was not entitled to deduct them as transportation costs under the leases and applicable regulations. As the excerpt above shows, Shell specified that it was not requesting that gathering costs from the Mars leases to MC 807 be deducted. Thus, the Mars

18

No. 14-20156

administrative decision does not constitute a public disclosure either.

### d)     Conclusion

In sum, neither the district court nor Shell pointed to any administrative disclosure relevant to the scheme alleged by Relators. The district court's and Shell's characterizations of the administrative proceedings were not only overly broad but fundamentally incorrect. The Auger and Mars administrative decisions do not concern the type of fraudulent scheme alleged by Relators and therefore do not constitute public disclosures.

### 3.     Judicial Disclosure

The district court also found that the fraud asserted by Relators was publicly disclosed in three previous lawsuits:

> Three previous cases publicize Shell's deduction of gathering costs as transportation. In 1997, it was accused of wrongfully deducting its cost to transport gas from leases in the Gulf of Mexico. Although this case concerned mis-measurement of gas, it did alert the public about Shell's transportation deductions.
>
> In a 2003 case, the relator accused Shell of fraudulently deducting transportation costs. Arnold and Little say that this only concerned costs incurred before 1988. The 2003 petition describes, however, the vast majority of the scheme to which Arnold and Little object. Although it concerned different leases, the 2003 case disclosed the mechanics of Shell's general practice.
>
> In 2001, Shell settled a case about underpaid royalties from leases in the Gulf of Mexico. The court made the settlement agreement part of the record, which preserved for later litigation the exact scheme that Arnold and Little pleaded. This disclosed the existence of potential claims about Shell's calculation of transportation expenses for oil from the Gulf of

19

Mexico.[36]

None of the three cited cases constitute a public disclosure of the fraudulent scheme alleged in this case.

### a)    *Wright*

In *Wright*, the relator argued that, for federal leases *issued prior to* March 1, 1988, neither the leases nor the applicable statutes and regulations permitted *any* costs to be deducted from the royalties owed to the government. The arguments were primarily based on the language of those pre-1988 leases and old statutory and regulatory law.[37] Concerning leases issued *after* March 1, 1988 (like the ones at issue in this case), the relator in *Wright* argued that statutory law still forbade the deduction of transportation costs, notwithstanding regulations and lease language.[38]

*Wright* is a very broad and complicated case that the district court mischaracterized by oversimplifying it. While it is technically true that "the relator accused Shell of fraudulently deducting transportation costs,"[39] the *Wright* relator accused nearly fifty defendants of violating the law by taking *any* deduction on *any* federal lease at *any* time. The relator also covered many other types of leases than the ones at issue here. The complaint alleged at least four violations on each monthly form submitted in connection with "some

---

[36] Second District Court Opinion at *2 (footnotes omitted). In a footnote, the court cited only to the docket information, not to any particular record entry, for the three cases on which it relied: *Wright v. Chevron* (No. 5:03–cv–264); *United States ex rel. Johnson v. Shell* (9:96–cv–66); *Grynberg v. Shell Oil Co.* (No. 2:97–cv–2357). *Id.* at n.7.

[37] *See, e.g.*, Fourth Amended Original Complaint at ¶¶ 65-84, *Wright v. Chevron USA, Inc.*, No. 5:03CV264 (E.D. Tex. Mar. 4, 2004), ECF No. 465 (asserting the applicability of the 1979 version of MMS regulations to the claims presented, which all concerned pre-1988 leases).

[38] *See id.* ¶¶ 222-228 (claiming that all deductions for transportation costs remain forbidden under two statutes).

[39] Second District Court Opinion at *3.

No. 14-20156

25,000 or more separate producing federal and tribal Indian leases."[40]

*Wright* concerned whether or not any and all deductions from royalties on federal leases were contrary to statute and thus barred forever. The instant case concerns whether or not Shell fraudulently deducted gathering costs as transportation costs in violation of clear law and lease terms to the contrary. Examining the *Wright* allegations at the level of specificity we required on remand, it is clear that *Wright* does not disclose the fraudulent scheme alleged here and therefore was not a public disclosure.[41]

### b)  *Johnson* and the 2001 Settlement Agreement

*Johnson* is not even superficially similar to this case, either in terms of the fraudulent scheme or the time period. *Johnson* concerned an alleged scheme occurring from 1988 through 1998 whereby Shell and others fraudulently misreported the market value of offshore oil to pay reduced royalties, in part by misrepresenting to MMS the amount of arm's-length purchases taking place at Shell's posted prices, and without regard to whether Shell's posted prices were equivalent to competitors' prices.[42]

The Tenth Circuit addressed a similar public disclosure argument concerning *Johnson* in *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180 (10th Cir. 2008):

> Kerr-McGee's final argument is that the information upon which Mr. Maxwell's suit was based was publicly disclosed in the course of the litigation and settlement of *United States ex rel. Johnson v. Shell* Oil Co., 33 F. Supp. 2d 528 (E.D. Tex. 1999). *Johnson* was a federal

---

[40] *See* Fourth Amended Original Complaint, *supra* note 36, ¶¶ 107-109.

[41] The district court stated, "Although it concerned different leases, the 2003 case disclosed the mechanics of Shell's general practice," Second District Court Opinion at \*2, which is the same type of overgeneralization that we cautioned against using on remand.

[42] *See* Complaint of the United States of America, *United States ex rel. Johnson v. Shell Oil Co.*, No. 9.96CV66 (E.D. Tex. Mar. 18, 1998), ECF No. 63.

> *qui tam* action filed against Kerr-McGee [and Shell]
> for the alleged fraudulent underpayment of royalties
> on federal leases covering a period from 1988 through
> 1998.
>
> . . . We conclude that because Mr. Maxwell's suit is
> based upon conduct occurring after the period of time
> covered in the Johnson litigation and a distinct
> fraudulent scheme, Mr. Maxwell's allegations are not
> "based upon" that suit. Although we have held that a
> subsequent lawsuit can be "based upon" allegations
> made in a prior lawsuit even when the two suits cover
> different periods of time, the "essential claim[s]" must
> be substantially "similar." The publicly filed
> documents in *Johnson* make no mention of Texon or
> the oil-for-services exchange practices at issue here.
> Although the *Johnson* settlement did include some
> Texon contracts, those contracts were not publicly
> available. The general allegation that Kerr-McGee
> was involved in fraudulent underpayment of royalties
> for offshore oil leases is not sufficiently specific to
> constitute a public disclosure because it is not in itself
> "enough information to discover related frauds," such
> as the fraud underlying Mr. Maxwell's suit.[43]

The scheme alleged in this case is also sufficiently different from the scheme
at issue in *Johnson* to escape the public disclosure bar.

There is no summary judgment evidence to support the district court's
conclusion that the 2001 settlement agreement in *Johnson* "preserved for later
litigation the exact scheme that Arnold and Little pleaded."[44] The evidence on
which Shell relied is the following passage in the *Johnson* settlement
agreement:

> 17. The parties agree that specifically excluded from

---

[43] 540 F.3d at 1186-87 (citations omitted).
[44] Second District Court Opinion at *2.

No. 14-20156

the scope and terms of this Agreement are:

* * *

> (m) Shell's transportation allowances which have not been filed for the leases listed in Exhibit F [including one lease at issue in this suit]; provided, however, that nothing in this Settlement Agreement shall preclude the Secretary from asserting any claims, actions, lawsuits, judgments, demands, fees, obligations, late payment interest, audits and restructured accountings, civil monetary penalties, or other liabilities in connection with any such transportation allowances.

That clause does not set out the specifics of any fraudulent scheme, much less the one at issue here. Because the scheme alleged in *Johnson* was unlike the scheme alleged in this case, and thus was not itself a public disclosure, we conclude that the vague clause in the settlement agreement also was not a public disclosure.

### c)    *Grynberg*

*Grynberg* concerned mismeasurement of gas and the overestimation of *otherwise allowable* transportation costs,[45] not the wrongful reclassification of non-deductible gathering costs as deductible transportation costs at issue in this case. It is irrelevant to the scheme at issue in this case and therefore was not a public disclosure.

### d)    Conclusion

Examining the three cases cited by the district court at the appropriate level of specificity given the details set out in the complaints in this case, we

---

[45] Complaint, *United States ex rel. Grynberg v. Shell Oil Co.*, No. 97-2357 (E.D. La. July 29, 1997), ECF No. 1.

23

conclude that Relators could not have synthesized the allegations in their complaints based on those sources. The cases are simply too factually and legally dissimilar to constitute public disclosures of the fraudulent scheme alleged in this case.

### 4.    Government Investigation

In our previous opinion, we noted that Shell had designated five categories of evidence, including a 2002-2003 audit as the fifth category.[46] We explained: "Relators contend that the information in categories four and five was never disseminated into the public domain. If true, then they would not be proper subjects for analysis."[47]

Despite that very clear statement, the district court reasoned on remand:

> Between 2002 and 2005–the years directly preceding the beginning of this lawsuit—the United States investigated Shell for taking the potentially improper deductions that Arnold and Little pleaded. The auditors say that this is irrelevant because it was not a public investigation. It does, however, show that the other public disclosures—from lawsuits, administrative investigations, and public debate— were sufficient to alert the government about the possibility of fraud.[48]

The district court disregarded the law of the case. It should not have analyzed those non-public disclosures in connection with the public disclosure bar.

### 5.    Conclusion

The court summarized its reasoning as follows:

> Arnold and Little object to each public disclosure separately. Even if their objections were persuasive in

---

[46] 690 F.3d at 292.

[47] *Id.* at 292 (citing *Reagan,* 384 F.3d at 175-76, and *Webster's Third New International Dictionary* 1836 (1993) (defining "public" as "exposed to general view")).

[48] Second District Court Opinion at *3.

isolation, the disclosures considered together are sufficient to bar this lawsuit. The public and the government knew that Shell was in a position to deduct these costs, had deducted them in the past, wanted to deduct them again, and was likely deducting them in 2006 and 2007. . . .

Because Joel F. Arnold and Randall L. Little's complaint could have been easily produced by synthesizing the public descriptions of the scheme, they will take nothing from Shell Exploration & Production Company, Shell Deepwater Development Systems, Inc., and Shell Offshore, Inc.[49]

As shown above, the district court erred with respect to every category of supposed public disclosures. Shell has not pointed to a single public disclosure of the fraudulent scheme alleged in this case, and there is therefore no basis for applying the public disclosure bar. We therefore reverse the judgment of the district court.

## C. This Case Should Be Reassigned To A Different District Judge.

This Circuit applies two different tests in deciding whether to reassign a case, as we discussed in *In re DaimlerChrysler Corp.*, 294 F.3d 697 (5th Cir. 2002):

> We have the power, on remand, to reassign a case to another judge. *See Johnson v. Sawyer,* 120 F.3d 1307, 1333 (5th Cir. 1997) (citing, in part, 28 U.S.C. § 2106 ("[A] court of appellate jurisdiction may ... require such further proceedings to be had as may be just under the circumstances.")). However, this is an "extraordinary" power that is "rarely invoked." *Id.* (quoting *In Re John H. McBryde,* 117 F.3d 208, 228–29 (5th Cir. 1997)).
>
> Other circuits have adopted two different tests to

___

[49] *Id.*

determine when a case should be reassigned to a different judge on remand. Our circuit has declined to decide which test we will use, and instead has employed both tests. Before the second test was adopted by some circuits, we cited to the original (first) test and applied it in our opinions. The first test, adopted by the Second, Sixth and Ninth Circuits, is as follows:

> Absent evidence of personal bias by the trial judge, appellate courts consider three factors in deciding whether to remand a case to a different judge: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Simon v. City of Clute,* 825 F.2d 940, 943–44 (5th Cir. 1987) (footnote omitted) . . . . However, the District of Columbia, Third, and Eleventh Circuits have used a more lenient test. For example, the D.C. Circuit has said that it will invoke the reassignment power when the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *United States v. Microsoft Corp.,* 56 F.3d 1448, 1463 (D.C. Cir. 1995) . . . ; *see also Haines v. Liggett Group, Inc.,* 975 F.2d 81, 98 (3d Cir.1992) (purpose of reassignment is "to avoid both bias and the appearance of bias"), *United States v. Torkington,* 874 F.2d 1441, 1446 (11th Cir. 1989) ("Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to

> the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public.").

> This circuit has since cited both tests and used them both in deciding questions of reassignment, while expressly declining to adopt one test or the other. *See, e.g., United States v. Winters,* 174 F.3d 478, 487–88 (5th Cir. 1999); *Johnson,* 120 F.3d at 1333. We find that both tests are met here.[50]

In *DaimlerChrysler*, we reassigned the case based on hostility and lack of impartiality:

> We find it necessary to order this and subsequent cases reassigned because of the hostility demonstrated toward the defendants in the district court's response to the petitions for writ of mandamus. Although it is certainly true that the district court agreed to abide by any ruling that this court makes, the failure of the district court to address our earlier opinion on this matter, and the court's response to the mandamus petition, convinces us that, notwithstanding all good faith efforts on the part of the district court, it would be exceedingly difficult for the district court to regain some impartiality in this case.[51]

In *Latiolais v. Cravins*, 574 F. App'x 429 (5th Cir. 2014), we reassigned a case based on the fact that apparently "it would be exceedingly difficult for [the presiding judge] to put aside the views he expressed about the evidence against Cravins that we deem substantial." Among other things, the judge commented at trial that "[t]here is no way on God's green earth that there has been any testimony that should hold Donald Cravins into this case. There was none. It was—it is not there. It's not there. It's clearly not there. I heard no

---

[50] 294 F.3d at 700-01.

[51] *Id.* at 701.

evidence, whatsoever. . . ."[52] We found that the reassignment would reduce waste rather than create it because of the existing judge's apparent bias.

In the prior appeal, we declined to have this case reassigned to a different judge on remand.[53] The circumstances are now different because the district judge disregarded our clear mandate and failed to apply the legal standards we established in our opinion for public disclosure and to address the specific questions we set out in that opinion. Facing a lengthy and detailed summary judgment record, the district judge issued a five-page opinion with few citations to either record evidence or relevant legal authority—not surprising given that neither the summary judgment evidence nor the law support the conclusions he reached. The opinion consists almost entirely of conclusory statements. The district judge reached the same conclusion he reached in his previous opinion by employing the same overly broad reasoning that we rejected before.

We conclude under both tests set out above that this case should be reassigned to a different district judge. Under the first test, we conclude that (1) we reasonably expect that the current judge would have "substantial difficulty" in setting aside his previously-expressed views, given that he failed to follow our previous mandate and applied reasoning we rejected in the previous appeal to reach the same erroneous conclusion; (2) reassignment would be advisable to preserve the appearance of justice, given the long delays, repeated errors, and cursory reasoning in the district court's opinions to date; and (3) reassignment would not create "waste and duplication out of proportion to any gain in preserving the appearance of fairness," given that this case has now sat for more than eight years without progressing past the public

---

[52] 574 F. App'x at 437.
[53] 690 F.3d at 294.

28

disclosure jurisdictional challenge.[54]  In this case, as in *Latiolais,* reassignment to a different judge should offer a reduction in waste because if we were simply to remand, we could reasonably expect more appeals of this nature.

Under the second test, for the same reasons, we conclude that the current district judge's treatment of this case "might reasonably cause an objective observer to question [the judge's] impartiality."[55]

Accordingly, this case should be and will be reassigned to a different district judge.

## III.   CONCLUSION

For the reasons set out above, we VACATE the district court's judgment, REMAND this action for further proceedings consistent with this opinion, and DIRECT the Chief Judge of the Southern District of Texas to reassign the case to a different district judge.

---

[54] *DaimlerChrysler*, 294 F.3d at 700-01 (quoting *Simon,* 825 F.2d at 943–44).

[55] *Id.* at 701 (quoting *Microsoft,* 56 F.3d at 1463).